IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jamie Daniels,                                   Case No. 3:16 CV 2830

                Plaintiff,     MEMORANDUM OPINION AND ORDER

      -vs-                                   JUDGE JACK ZOUHARY

John Tharp, et al.,

                Defendants.

## INTRODUCTION

Plaintiff *pro se* Jamie Daniels brings this Section 1983 action against Lucas County Sheriff John Tharp, Nurse Mary Ann Riddle, Nurse Anissa Floure, Dr. Steven Dood, Dr. John Uche, and the Lucas County Board of Commissioners (Doc. 15). He alleges Defendants deprived him of his rights under the Eighth and Fourteenth Amendments by exposing him to black mold and failing to provide him prompt medical treatment. Defendants move for summary judgment (Docs. 52–53), and Daniels opposes (Doc. 62). Several Defendants have also filed a Reply (Doc. 66) and move to strike exhibits attached to the Opposition (Doc. 65).

## BACKGROUND

The record in this case is sparse and contains many gaps. From what this Court can decipher from the Amended Complaint (Doc. 15) and the parties' briefings (Docs. 52–53, 62, 66), Daniels was held as a pretrial detainee in the Lucas County Correctional Center (LCCC) from November 2014 to February 2015, and then as a federal government detainee from March to June 2015 (Doc. 15 at ¶ 5).

Daniels returned to LCCC as a state pretrial detainee from October 2015 through January 2016 (*id.* at ¶ 16). He is currently serving a fifty-four-month sentence at the Allen Correctional Institution (*id.*).

Daniels alleges his health began to deteriorate "at a rapid pace" around May 25, 2015 (*id.* at ¶ 19). His symptoms included "shortness of breath, rectal bleeding, migraines, and pus-filled rashes" (*id.*). Daniels submitted several "sick call" slips informing LCCC staff about his symptoms, but he contends the slips went unanswered (*id.* at ¶ 20). He then sought redress through the inmate grievance procedure (*id.*).

Dr. Uche eventually examined Daniels and prescribed an antibiotic for his rash (*id.* at ¶ 21; *see also* Doc. 62-1 at 1). A few days later, Nurse Riddle withheld the antibiotic because Daniels was refusing other medication (Doc. 62-1 at 1–2; *see also* Doc. 55-1 at ¶ 9). Daniels continued to complain about his rash, breathing difficulty, and stomach issues. Dr. Uche then saw Daniels again, but did not prescribe any further medication (Doc. 15 at ¶ 26).

Around this same time, Daniels alleges he learned through others that LCCC was contaminated with black mold "that saturated the showers, drinking fountains, recreational areas, and the air ducts" (*id.* at ¶ 25). Daniels contends his continuous exposure to the mold contributed to his chronic obstructive pulmonary disease (COPD), which was diagnosed after he left LCCC (*id.* at ¶ 27).

Daniels left LCCC at the end of June. He then visited the emergency room at St. Vincent, where he claims he was diagnosed with ulcerative colitis (Doc. 62-3 at 2). Defendants concede that Daniels was diagnosed with ulcerative colitis by fall 2015 (*see* Doc. 53 at 4).

Daniels returned to LCCC in mid-October 2015. By late October, he claims his ulcerative colitis symptoms flared up (Doc. 15 at ¶ 30; *see also* Doc. 62-4 at 1–5). Due to loss of blood, Daniels contends he felt faint and eventually passed out (Doc. 15 at ¶ 30; *see also* Doc. 62-4 3–5). A few

days later, Daniels complained that Dr. Uche was denying his civil rights and his care was reassigned to Dr. Dood (Doc. 55-1 at ¶¶ 11–12).

In mid-November, Dr. Dood examined Daniels (*id.* at ¶ 13). Because Daniels' bloodwork showed a "very slight abnormality" in his hematocrit and hemoglobin levels, Dr. Dood ordered a colonoscopy (*id.*). The colonoscopy came back normal for ulcerative colitis but showed Daniels had hemorrhoids (*id.* at ¶ 14). Shortly thereafter, Plaintiff was transferred to another facility, where it appears he is receiving treatment. This action followed.

## STANDARD OF REVIEW

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Federal Civil Rule 56(a). When evaluating a motion for summary judgment, this Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court may not weigh the evidence or make credibility judgments; rather, it evaluates only whether the record contains sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to avoid summary judgment. *Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 341 (6th Cir. 2006) (citation omitted).

## DISCUSSION

Defendants contend summary judgment is appropriate for two reasons. First, Defendant Tharp argues this action should be dismissed for failure to prosecute. Second, all Defendants contend Daniels has failed to marshal enough evidence to create a genuine dispute of material fact as to whether they violated his rights under the Eighth and Fourteenth Amendments.

**Deliberate Indifference**

Turning first to the merits of Daniels' claims, the Constitution does not mandate comfortable conditions of confinement. *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). But the Eighth and Fourteenth Amendments do require that prisoners are provided with reasonably adequate food, clothing, shelter, sanitation, recreation, and medical care. *See Helling v. McKinney*, 509 U.S. 25, 31–32 (1993). Failure to provide these necessities violates an inmate's right to be free from cruel and unusual punishment. *Bellamy v. Bradley*, 729 F.2d 416, 419 (6th Cir. 1984).

"The Eighth Amendment[] . . . generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Phillips v. Roane County*, 534 F.3d 531, 539 (6th Cir. 2008). Here, Daniels brings claims under both Amendments. The standard for evaluating his claims is the same. *Id.* at 539–40.

Failure to provide adequate medical care to a prisoner violates the prisoner's constitutional rights only when it results from "deliberate indifference" to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a claim, the prisoner must demonstrate both an objective and a subjective component. He must show (1) his medical condition posed a "substantial risk of serious harm" to him, and (2) prison officials acted with deliberate indifference to that risk. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). This same two-part test applies to conditions-of-confinement challenges. *See Helling*, 509 U.S. at 35.

"Deliberate indifference is characterized by obduracy or wantonness—it cannot be predicated on negligence, inadvertence, or good faith error." *Reilly v. Vadlamudi*, 680 F.3d 617, 624 (6th Cir. 2012). "Thus, to prove the required level of culpability, a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of

4

harm to the inmate existed, and (3) consciously disregarded that risk." *Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010). Allegations of medical malpractice or negligent diagnosis and treatment fail to state a deliberate indifference claim. *Jennings v. Al-Dabagh*, 97 F. App'x 548, 549–50 (6th Cir. 2004).

### *Conditions of Confinement*

As for Daniels' claim that Defendants violated his rights by exposing him to black mold, "[e]xposure to black mold may, in an appropriate case, be sufficiently serious as to satisfy the objective component of the Eighth Amendment." *Deas v. Ingham Cty. Jail*, 2018 WL 3853521, at *3 (W.D. Mich. 2018). But "some exposure to black mold is a risk that society has chosen to tolerate." *Watson v. Grainger Cty. Sheriff's Dep't*, 2016 WL 1611119, at *4 (E.D. Tenn. 2016) (quoting *McIntyre v. Phillips*, 2007 WL 2986470, at *3 (W.D. Mich. 2007)). *See also Scarbrough v. Tennessee*, 2016 WL 6892744, at *3 (E.D. Tenn. 2016); *Juliot v. Osborne*, 2014 WL 4259429, at *4 (W.D. Ky. 2014); *Perryman v. Graves*, 2010 WL 4237921, at *3 (M.D. Tenn. 2010).

Here, Daniels fails to produce admissible evidence showing he was exposed to unreasonably high levels of black mold or that Defendants were deliberately indifferent to the risks he faced from that exposure. *See Helling*, 509 U.S. at 35–36; *Morales v. White*, 2008 WL 4585340, at *14–15 (W.D. Tenn. 2008). Daniels' bare assertions that LCCC was infested with black mold, the named Defendants were aware of that infestation, and some of his symptoms were caused by mold exposure may have been enough to state a viable claim, but he may not rely merely on these allegations at the summary judgment stage. Instead, he must "make an affirmative showing with proper evidence in order to defeat the [M]otion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2007).

To support his conditions-of-confinement claim, Daniels points to two of his grievances and an opinion article published in the Toledo Blade (Doc. 62 at 7–8). Even assuming the Blade article

5

is admissible, the article says nothing about black mold or Defendants' awareness of any mold (*see* Doc. 62-2). And the grievances, as well as the references within those grievances to purported statements by correctional officers, are inadmissible hearsay (*see* Doc. 62-1 at 8–9). *Alexander*, 576 F.3d at 558. *See also King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014) (holding that an inmate's self-generated affidavit about her doctors' medical instructions was inadmissible hearsay and could not be used to create a genuine dispute of material fact). Based on the slim record provided, it is unclear whether Daniels ever actually told the named Defendants he believed he was being exposed to toxic levels of black mold, or that Defendants were otherwise aware of any mold.

Further, the symptoms Daniels attributes to mold exposure (shortness of breath, migraines, and rashes) are not objectively serious (*see* Doc. 62 at 8–10). Daniels also fails to produce any evidence beyond his own speculation that mold exposure caused his symptoms. *See Blackmore v. Kalamazoo County*, 390 F.3d 890, 897–98 (6th Cir. 2004). As his own exhibit states (Doc. 62-7), Daniels' symptoms may be attributable to other sources (*see* Doc. 55-1 at ¶¶ 15–16; Doc. 62-7). In short, Daniels fails to produce sufficient evidence from which this Court, or a jury, could draw a reasonable inference that Defendants were anything more than negligent in failing to identify or address his alleged mold exposure.

### *Inadequate Medical Treatment*

Turning to Daniels' medical-indifference claims, Sheriff Tharp and the Lucas County Board of Commissioners' Motions for Summary Judgment are granted. Nothing in the Amended Complaint or Daniels' Opposition indicates that Sheriff Tharp had any input as to Daniels' medical treatment or that he was aware of the status of Daniels' care. *See Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010). Standing alone, "[r]espondeat superior is not a proper basis for liability under § 1983." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006). Daniels also fails to show that

a prison policy or custom caused his alleged constitutional injury, as required to establish municipality liability against the Board. *Cady v. Arenac County*, 574 F.3d 334, 345 (6th Cir. 2009).

Daniels' claims against the remaining four Defendants can be divided into two groups: his treatment between May 2015 through June 2015, and between October 2015 to January 2016.

**May 2015 to June 2015**

Daniels claims his health began to deteriorate rapidly on May 25, with symptoms including shortness of breath, migraines, a pus-filled rash, and rectal bleeding. Although the exact date is unclear, Daniels was seen by Dr. Uche about a week later and was prescribed an antibiotic for his rash (*see* Doc. 62-1 at 1). A few days later, Nurse Riddle temporarily withheld the antibiotic because Daniels was refusing to take other prescribed medication (*id.*; *see also* Doc. 55-1 at ¶¶ 9–10). Daniels then submitted additional grievances indicating his rash was "flaring up again" and he was having some respiratory and stomach issues (Doc. 62-1 at 2). On June 10, Daniels saw Dr. Uche again. According to Daniels, Dr. Uche determined his symptoms were caused by anxiety or a panic attack and did not require medication beyond his prescribed psychiatric medication (*id.* at 7). About a week later, Daniels was seen by Dr. Dood, who prescribed Daniels additional medication for his rash and a steroid (*id.* at 9).

Nothing in the record reflects that Daniels' conditions during this time period were "diagnosed by a physician as mandating treatment." *Blackmore*, 390 F.3d at 897 (citation omitted). Nor does he describe symptoms so obvious that even a lay person would recognize the necessity for prompt medical attention. *Id. See also Cain v. Irvin*, 286 F. App'x 920, 927 (6th Cir. 2008) ("[T]his test does not address whether the injury is merely observable to bystanders; if that were the case, even untreated bloody noses or visible scrapes would satisfy the objective prong . . . . Instead, the obviousness test is whether a lay person would perceive the need for immediate medical assistance.").

Further, contrary to Daniels' assertions, the record reflects that he was seen by medical staff on a regular basis and prescribed a variety of medications as well as tests for his conditions (*see generally* Doc. 62-1). Daniels raises a delay and adequacy-of-treatment challenge, not a claim that he received no medical care. Defendants' medical expert, Dr. Evans, attests that Daniels' conditions were not serious and that the treatment he received was adequate (Doc. 55-1 at ¶¶ 6, 17). In response, Daniels fails to provide any medical evidence showing the delay in his treatment had a detrimental effect or that his treatment was inadequate. *See Rhinehart v. Scutt*, 894 F.3d 721, 737–38 (6th Cir. 2018); *Blackmore*, 390 F.3d at 898–99. He therefore fails to satisfy the objective prong of his deliberate indifference claims.

In addition, Daniels fails to produce sufficient evidence to satisfy the subjective prong. Nurse Floure's involvement in Daniels' care was limited -- reviewing and responding to his medical grievances. The record contains insufficient information to conclude that she handled the grievances negligently, much less with deliberate indifference. Daniels' disagreement with Dr. Uche's determination that a panic attack was the primary cause of his symptoms is also insufficient to establish deliberate indifference. *See Rhinehart*, 894 F.3d at 741 ("Allegations 'that more should have been done by way of diagnosis and treatment' and 'suggest[ions]' of other 'options that were not pursued' raise at most a claim of medical malpractice, not a cognizable Eighth Amendment claim.") (citation omitted). Although Dr. Uche's decision not to further investigate what was causing Daniels' symptoms might have been negligent, *see Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001), it does not show that Dr. Uche "consciously expos[ed]" Daniels to a risk of serious harm. *See LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001). Further, there is no evidence that Dr. Dood's prescribed course of treatment, made just days before Daniels' release, was inadequate (*see*

Doc. 62-1 at 9). In short, there is no basis to conclude these Defendants recklessly disregarded a serious risk to Daniels' health between May and late June 2015.

Nurse Riddle's decision to temporarily withhold Daniels' antibiotic presents a closer question. But it appears Dr. Uche, the prescribing physician, made the ultimate decision to withhold the antibiotic because Daniels was refusing to take his psychiatric medication (Doc. 62 at 11). And according to Dr. Evans, Daniels "frequently refused to take his medication" (Doc. 55-1 at ¶¶ 9–10). The Sixth Circuit has previously found a defendant was not deliberately indifferent when some of the delay in the prisoner's treatment was due to the prisoner's "refusal to follow the doctor's recommendation." *Jamerson v. Beauchamp*, 2018 WL 6584126, at *3 (6th Cir. 2018) (citing *Thomas v. Coble*, 55 F. App'x 748, 749 (6th Cir. 2003)).

Daniels also contends this Court arbitrarily denied his Motion for Medical Expert Assistance (*see* Doc. 62 at 10; *see also* Docs. 42, 56). This Court construes this assertion as a request to reconsider. As this Court previously stated, "28 U.S.C. § 1915 does not grant this Court authority to pay his expert witness fees" (Doc. 56 at 1). Although Federal Evidence Rule 706 provides this Court with discretion to appoint an expert witness in certain cases, appointments under that Rule are rare. Further, that Rule is "not meant as a vehicle for the court to assist the plaintiff in proving h[is] case." *Peterson v. Burris*, 2017 WL 8289655, at *2 (6th Cir. 2017). While this Court sympathizes with Daniels' financial situation, the purpose of a court-appointed expert under Rule 706 is to assist the trier of fact, not to serve as his advocate. This Court does not require medical-expert assistance to understand the record in this case, and therefore denies the request to reconsider.

**October 2015 to January 2016**

By late October, Daniels claims his ulcerative colitis began to flare up again, causing rectal bleeding (*see* Doc. 62-4 at 1). It does not appear Daniels complained of any other symptoms during

9

this time period. On October 26, he contends he told "Nurse Jennifer" that he was feeling "dizzy, light headed[,] . . . and faint" due to an "extreme loss of blood" from his ulcerative colitis (*id.* at 3). Nurse Jennifer is not a Defendant in this case. Daniels also showed a correctional officer his bloody stool around this same time (*id.*). He was brought to the medical unit later that day, where he was cared for again by Nurse Jennifer (*id.* at 4). The next day, October 27, Daniels contends he passed out or "had a black out" (*id.* at 5). "Nurse Lynn," another non-party, arrived within forty minutes of the incident (*id.*). "After another hour or so," Daniels was moved to the medical unit and Nurse Floure gave him medication that helped with his symptoms (*id.*). A few days later, on October 31, Daniels had another flare up (*id.* at 6). A non-party nurse responded (*id.*). That same day, Daniels was also seen by Dr. Uche (*id.* at 7). Shortly thereafter, his care was transferred to Dr. Dood (*id.*; *see also* Doc. 55-1 at ¶ 12). On November 2, Daniels claims Nurse Riddle withheld medication (Doc. 62-4 at 8). Around mid-November, Dr. Dood examined Daniels bloodwork and ordered a colonoscopy (*id.* at 9; *see also* Doc. 55-1 at ¶¶ 13–14). In mid-December, the colonoscopy came back normal for ulcerative colitis (Doc. 55-1 at ¶ 14). Daniels left LCCC not long after.

        This Court will assume that Daniels' severe blood loss causing him to pass out on October 26 is sufficiently serious to satisfy the objective prong of the deliberate-indifference test. *See Blackmore*, 390 F.3d at 897. But even so, his claims fail under the subjective component of the test. Daniels experienced his most serious symptoms on October 26 and 27. But there is no indication that Nurse Riddle, Dr. Uche, or Dr. Dood were involved with his treatment on those days or were aware of his declining condition. Nurse Floure was involved with Daniels treatment on October 27, but the record reflects her involvement was limited to providing him with effective medication. And although Daniels alleges Nurse Riddle denied him medication on November 2, he provides little information

about the circumstances leading to the denial, and no information about the length or effect of the delay in receiving the medication.

Nor does Daniels provide any basis for finding Dr. Uche or Dr. Dood were deliberately indifferent to his serious medical needs during this time period. Dr. Uche was only briefly involved with Daniels' treatment before his care was transferred to Dr. Dood. Within a few weeks, Dr. Dood ordered medication, bloodwork, and a colonoscopy (Doc. 62-4 at 9; *see also* Doc. 55-1 at ¶¶ 13–14). Where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Daniels offers nothing more than his disagreement with Dr. Dood's chosen course of treatment. Because Daniels has failed to show Dr. Dood's choice of treatment was inadequate or caused him harm, this Court will not second guess Dr. Dood's medical judgment.

**Failure to Prosecute and Motion to Strike**

That leaves the Motion to Dismiss for failure to prosecute (Doc. 52) and the Motion to Strike (Doc. 65). Based on the above, those motions are denied as moot.

## CONCLUSION

The Motion to Dismiss due to failure to prosecute (Doc. 52 at 2, 4) is denied, the Motions for Summary Judgment (Docs. 52–53) are granted, and the Motion to Strike (Doc. 65) is denied as moot. This case is dismissed.

IT IS SO ORDERED.

                                                s/ *Jack Zouhary*
                                                JACK ZOUHARY
                                                U. S. DISTRICT JUDGE

January 31, 2019